IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **THE BIG GREEN EGG, INC.,** | |
| *Plaintiff*, | |
| v. | Civil Action No. |
| **AIYIXIAO, *et al.,*** | |
| *Defendants.* | |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR *EX PARTE* TEMPORARY
RESTRAINING ORDER, ASSET FREEZE ORDER,
AND ORDER TO SHOW CAUSE

## INTRODUCTION

Plaintiff The Big Green Egg, Inc. ("Plaintiff") manufactures and distributes barbecue smokers and grills under the well-known BIG GREEN EGG trademarks (collectively, "Plaintiff's Marks" or "Marks"). Plaintiff has invested considerable time and money building up tremendous goodwill in its trademarks and related goods. Plaintiff takes great care to protect its intellectual property rights and spends considerable time and money enforcing them against infringers and counterfeiters. Despite these efforts, infringers and counterfeiters proliferate.

On information and belief, Defendants are Chinese companies or individuals that sell goods bearing counterfeit and/or infringing copies of Plaintiff's Marks through virtual storefronts on various e-commerce marketplaces such as Alibaba, AliExpress, DHGate, Amazon, eBay, and/or Wish (each a "Marketplace" and collectively the "Marketplaces"). Defendants are advertising and selling unauthorized goods bearing counterfeit and/or infringing copies of Plaintiff's Marks, as well as using Plaintiff's Marks and confusingly similar variations thereof to advertise and sell unauthorized versions of Plaintiff's goods, thereby severely harming Plaintiff's valuable brand and associated goodwill. Counterfeit and/or infringing goods typically do not meet relevant product safety and labeling standards, thereby irreparably harming Plaintiff's valuable brand and goodwill and

presenting a safety hazard to unwary purchasers. Plaintiff seeks an *ex parte* temporary restraining order shutting down Defendants' virtual storefronts on the Marketplaces and freezing Defendants' financial accounts tied thereto.

## FACTUAL BACKGROUND

### I.    PLAINTIFF'S PRODUCTS AND MARKS.

Plaintiff The Big Green Egg, Inc. ("Plaintiff") manufactures and distributes barbecue smokers and grills under the well-known BIG GREEN EGG trademark and related trademarks. Ed Fisher, the Company's founder, discovered the "kamado" (translated to "oven" or "hearth" in Japanese) domed clay oven during his travels in Japan as an American serviceman in the 1950s. (Declaration of Gary Hooper ¶ 4.) In 1974, the first Big Green Egg store opened in Atlanta. Originally importing both Japanese and Chinese kamados, Ed Fisher soon realized that, despite the great results they produced, the original clay cookers were fragile and prone to breaking after exposure to various elements such as high heat and weather. For this reason, Ed Fisher committed to modernizing and perfecting the ancient cooking technology and to distinguish his kamado cookers from conventional grills on the market. (*Id.* ¶ 5.) In addition to a distinctive green, dimpled surface, Ed Fisher adopted the trademark BIG GREEN EGG and now, forty-five years later, BIG GREEN EGG is one of the world's most recognizable

brands.  The Company's cookers are widely known as EGG cookers. (*Id.* ¶ 6.) As EGG cookers gained popularity, the Company committed to produce an improved version of their cooker using a higher grade of ceramics that was specifically developed by NASA to withstand and hold extremely high heat levels without suffering damage. The result was a superior cooker that is stronger, more durable, and provides better heat insulation than anything else on the market, a distinction Big Green Egg is known for today. (*Id.* ¶ 7.)

The shape of the Big Green Egg cooker is designed to contain the heat by using two draft doors, one at the bottom and another at the top. The two draft doors work in conjunction with each other. The result is precise temperature control and optimal cooking performance. (*Id.* ¶ 8.) The innovative technology and shape of the grill allows for faster cooking than other grills, requires less charcoal, and holds and distributes heat more evenly. It can be used to grill, roast, smoke, and bake, and can make anything from turkey to Bundt cakes. (*Id.* ¶ 9.) Presently, more than 4,000 retailers across the nation stock Big Green Egg products, which has grown more than 20 percent every year for the past two decades. Not only that, many restaurants in the Atlanta area alone feature the Company's EGG cookers. Kevin Rathbun Steak, a prime steakhouse located in the Atlanta area and widely known

as one of the top steakhouses in the United States, features menu items such as a pork shoulder entrée smoked on a Big Green Egg cooker. (*Id.* ¶ 10.)

The revolutionary outdoor cooking technology of Big Green Egg has garnered the brand a cult-following in the universe of kamado users. Festivals, known as EGGFESTS and EGGTOBERFEST, are among the many events widely held where new techniques are shared during cooking exhibitions and communities of users are forged. (*Id.* ¶ 11.) Big Green Egg is now the world's largest producer and international distributor of the highest-quality ceramic cooking system. The grills are put through strict quality procedures during manufacturing to ensure perfected production. (*Id.* ¶ 12.) The Company continues to expand and now includes seven different sizes with hundreds of accessories, known as EGGCESSORIES, designed specifically for use on the grill, which are available throughout the world in over fifty countries. (*Id.* ¶ 13.)

Plaintiff owns numerous federal trademark registrations for Plaintiff's Marks, including the following:

| Mark | U.S. Federal Reg. Nos. |
|---|---|
|  | 2627587 |
| BIG GREEN EGG | 4037333 |
|  | 4263121 |
| EGGFEST | 4141337 |
| EGGSPERT | 4488807 |
| EGGHEAD | 4259981 |
| EGGCESSORIES | 4145282 |
| EGG MATES | 4628797 |
| LITTLE GREEN EGG | 5218824 |
|  | 4917107 |

True and correct copies of the certificates of registration for these trademarks are attached as Exhibit A to the Complaint. (*Id*. ¶ 15.)

## II.    PLAINTIFF'S ONGOING BATTLE AGAINST COUNTERFEITERS.

With the popularity of Plaintiff's brand and product line has come a flood of counterfeit and infringing products. Many third parties use Plaintiff's Marks on or in connection with the advertising and sale of a variety of products, thereby

infringing the Plaintiff's trademarks. (*Id*. ¶ 16.) The sale of counterfeit and infringing products poses a real threat to Plaintiff's brand, the sustainability of Plaintiff's business, and to the individuals and families who unwittingly purchase them. (*Id*. ¶ 17.)

Plaintiff spends considerable time and resources fighting infringers and counterfeiters. Plaintiff regularly uses standard notice and takedown procedures to remove counterfeit and infringing goods from the Internet. Despite Plaintiff's efforts, counterfeit and infringing goods continue to be readily available through the Marketplaces. Marketplace intellectual property rights ("IPR") notice and takedown mechanisms have not been fully effectual in Plaintiff's continuing fight against the marketing and sale of counterfeit and/or goods bearing one or more of Plaintiff's Marks. (*Id*. ¶¶ 18-20.) The proliferation of counterfeit products harms Plaintiff's valuable brand in several ways. First, Plaintiff is only able to control the quality of products manufactured and sold under its brands. Additionally, if consumers are dissatisfied with the quality of the counterfeit product they purchase, that displeasure will be attributed to Plaintiff and its brand. (*Id*. ¶ 21.)

If a Marketplace bans a seller because of repeat IPR infringement complaints, the seller can easily establish a new identity, set up a new virtual storefront and resume selling counterfeit and/or infringing goods in little time.

Most Marketplaces do not require sellers to provide complete or accurate physical contact information, and others allow the sellers to operate with complete anonymity. (Declaration of Jeffrey B. Sladkus ¶¶ 13-16.) With such anonymity, sellers can advertise and sell counterfeit and/or infringing goods without any risk of an adverse judgment. This allows these sellers to destroy any evidence of their unlawful conduct and quickly transfer funds in the event of a legal proceeding. To successfully shut these sellers down and afford an aggrieved party the opportunity to obtain some type of remedy under the prevailing U.S. trademark laws, it is exceedingly important that the targets remain unaware that they are the subject of anti-counterfeiting measures; otherwise, they will disappear without a trace. (*Id.* ¶¶ 17-18.)

Plaintiff can usually identify counterfeit and/or infringing versions of its goods by visual inspection; the country of origin; the packaging materials for the products; and/or the price at which the products are sold. Working together with the law firm of The Sladkus Law Group, Plaintiff or Plaintiff's counsel has confirmed that each Defendant is using at least one of Plaintiff's Marks or a colorable imitation thereof on or in connection with the sale of non-genuine products. None of the Defendants is, or has ever been, authorized to manufacture,

market, or distribute any of Plaintiff's goods or to use Plaintiff's Marks.

(Declaration of Gary Hooper ¶ 22.)

## LEGAL ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS.

A court will issue a temporary restraining order where the requesting party demonstrates the following four factors: (1) it has a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury if the order is not granted; (3) that the threatened injury to the plaintiff outweighs the harm the relief would inflict on the non-movant; and (4) entry of the order would serve the public interest. *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

Courts may issue a temporary restraining order without notice to the adverse party where the facts in an affidavit demonstrate the moving party will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition and the movant's attorney certifies in writing the reasons why notice should not be required. FED. R. CIV. P. 65(b)(1). Where a defendant's identity is known and notice can be feasibly given, the court may still grant an *ex parte* seizure order if providing notice to the defendant would render fruitless the further prosecution of the action. *AT&T Broadband v. Tech*

*Communications, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). "The weight of
authority around the country appears to favor the granting of *ex parte* seizure
orders in trademark counterfeiting cases, where fake versions of well-known
brands are deliberately passed off to the public as the genuine article." *Fimab-
Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248,
249-50 (S.D. Fla. 1982). The justification for an *ex parte* seizure order is even
more compelling where a significant amount of evidence pertaining to the
counterfeiting activity is in electronic form, and therefore subject to quick, easy,
and untraceable destruction by the Defendants. *Dell Inc. v. BelgiumDomains, LLC*,
2007 WL 6862341 at *2 (S.D. Fla. 2007); *see also Chanel, Inc. v.
Chanel255.ORG, et al.*, 2012 WL 12845630 at *5 (S.D. Fla. 2012).

Requests for equitable relief invoke the court's inherent equitable powers to
order preliminary injunctive relief, including an asset freeze, in order to assure the
availability of permanent relief. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*,
51 F.3d 982, 987 (11th Cir. 1995) (affirming district court's asset freeze order
where plaintiff sought permanent injunction and equitable remedy of defendants'
profits from counterfeiting). Plaintiff's requests for permanent injunctive relief and
disgorgement of the Defendants' profits are requests for relief in equity. *Id*. Such
asset freezes are particularly appropriate against sellers of counterfeit goods who

are likely to hide their ill-gotten profits if their assets are not seized. *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (affirming asset freeze order against seller of counterfeit goods).

## II.    THE COURT HAS JURISDICTION OVER DEFENDANTS.

Each Defendant has advertised and offered its counterfeit and/or infringing goods for sale to prospective purchasers in the United States. Using a suitable pretext, Plaintiff's counsel set up accounts with the Marketplaces using Atlanta, Georgia as its location. Counsel searched for Plaintiff's branded goods on the various Marketplaces, identified sellers advertising counterfeit goods bearing Plaintiff's registered Marks or non-genuine goods advertised for sale under confusingly similar variations of Plaintiff's Marks, and confirmed that each seller was willing and able to ship these counterfeit and/or infringing products to the U.S. Counsel also confirmed that each Defendant was prepared to accept payment in U.S. Dollars through a U.S.-based financial institution such as AliPay, ContextLogic, DHPay, or PayPal. Each Defendant advertised its willingness and ability to sell these counterfeit and/or infringing goods to customers in this judicial district, thereby purposefully directing its commercial activities here. (Declaration of Jeffrey B. Sladkus ¶ 7.)

This Court has jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k)(2), which provides jurisdiction over a foreign defendant that is not subject to the jurisdiction of any state's court of general jurisdiction where exercising jurisdiction is consistent with the United States Constitution and its laws. Each Defendant has offered counterfeit or infringing goods for sale throughout the United States, including in Georgia. Each Defendant is willing to engage in commercial transactions with residents of the United States, ship infringing or counterfeit goods to the United States, and receive payment in U.S. Dollars. Therefore, it is reasonable for the Defendants to expect that they may be sued in the United States. *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1542-47 (11th Cir. 1997) (holding court had personal jurisdiction over foreign corporation where defendant placed ads for securities in two airlines' in-flight magazines, mailed offering materials directly to U.S. investors, and maintained U.S. bank accounts to receive payment from investors.); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355-58 (11th Cir. 2013) (affirming jurisdiction over non-resident who sold counterfeit products through fully-interactive website.)

## III.   PLAINTIFF IS ENTITLED TO AN *EX PARTE* TRO.

There is no question that the Defendants are marketing and selling unauthorized goods bearing counterfeit copies of Plaintiff's Marks or otherwise

using Plaintiff's Marks in a manner that is likely to cause consumer confusion. Plaintiff is entitled to an immediate restraining order prohibiting Defendants from continuing to infringe on its valuable trademarks and to protect unwary consumers from potentially dangerous products.

### A.    Plaintiff Is Likely To Succeed On Its Claims.

Plaintiff owns numerous federally registered trademarks, including but not limited to several registrations for BIG GREEN EGG, EGGFEST, EGGSPERT, EGGHEAD, EGGCESSORIES, EGG MATES, LITTLE GREEN EGG, and a three-dimensional trademark consisting of the color green applied to a kamado style grill and smoker.  True and correct copies of the certificates of registration are attached as Exhibit A to the Complaint. The certificates of registration are *prima facie* evidence of the validity of the registered mark and the registration of the mark, Plaintiff's ownership of the mark, and Plaintiff's exclusive right to use the registered mark in commerce on or in connection with the goods in the certificates. 15 U.S.C. § 1057(b).

To determine whether Defendants are infringing Plaintiff's Marks, the Court will consider the strength of Plaintiff's Marks, the similarity of the marks, and the similarity of the goods. Plaintiff's Marks are inherently distinctive and have been

registered on the Principal Register for many years and, as a result, have achieved significant recognition among the relevant consuming public.

Plaintiff and/or the undersigned counsel have reviewed all of the product listings for each Defendant and confirmed that each Defendant is using a counterfeit and/or infringement of one or more of Plaintiff's Marks (i) on non-genuine reproductions of Plaintiff's goods, or (ii) in association with the marketing or sale of other goods in such a manner as to confuse customers into believing the goods are genuine.

### B.   Plaintiff Is Likely To Suffer Irreparable Harm.

Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *Ferrellgas Partners, L.P*, 143 Fed. Appx. 180, 190 (11th Cir. 2005). Evidence that a defendant sells a line of infringing products intending to capitalize on the plaintiff's goodwill constitutes "overwhelming evidence" that the plaintiff is likely to suffer irreparable harm. *Cathedra Art Metal Co. v. Divinity Boutique, LLC*, 2018 WL 2356181 at * 2 (N.D. Ga. 2018); *see also InternetShopsInc.com v. Six C Consulting, Inc.*, No. 1:09–cv–698–JEC, 2011 WL 1113445, at *6 (N.D. Ga. Mar. 24, 2011) (dilution of goodwill, loss of control of reputation, and loss of trade are sufficient to find irreparable injury). "The most corrosive and irreparable harm attributable to trademark infringement is the

inability of the victim to control the nature and quality of the defendants' goods." *Crossfit, Inc. v. Quinnie*, 232 F.Supp.3d 1295, 1316 (N.D. Ga. 2017).

Plaintiff has spent considerable time, money, and effort building its valuable brand. The proliferation of counterfeit and/or infringing copies of Plaintiff's goods erodes the distinctiveness of Plaintiff's Marks and diminishes their value and associated goodwill. Because Plaintiff cannot control the quality of counterfeit or infringing goods, the sale of inferior counterfeit or infringing goods by Defendants will have a materially adverse effect on Plaintiff's business reputation and the goodwill associated with Plaintiff's Marks. This is sufficient to establish a likelihood of irreparable harm. *Noorani Trading Inc. v. Bijani*, No. 17-1344, 2017 WL 8292437 at *9 (N.D. Ga. May 4, 2017). The widespread and unauthorized use of Plaintiff's Marks in the marketing, offering for sale, and sale of counterfeit and/or infringing goods threatens the extensive goodwill associated with Plaintiff's business and Plaintiff's Marks, and will continue to cannibalize the sale of Plaintiff's genuine goods. There is a significant threat that Plaintiff will suffer irreparable harm without an injunction. *Mud Pie, LLC v. Deck the Halls, Y'all, LLC*, No. 17-2789, 2017 WL 8942387 at *3 (N.D. Ga. 2017).

**C.    The Balance Of Hardships Favors Plaintiff.**

If Defendants are permitted to continue to sell their inferior counterfeit and/or infringing goods, Plaintiff's reputation and the value of the goodwill associated with its Marks will be irreparably damaged. Moreover, counterfeiters or infringers such as Defendants capitalize off the goodwill that Plaintiff has built in its goods and brand while selling inferior and sometimes dangerous goods to unsuspecting consumers. In contrast, enjoining Defendants from selling counterfeit and/or infringing goods poses little to no risk of damaging the goodwill, if any, associated with the Defendants.

**D.    An Injunction Will Serve The Public Interest.**

Plaintiff's goods undergo rigorous quality control testing. In contrast, Defendants' goods are not required to meet any federal or state safety requirements. Moreover, counterfeit and/or infringing goods do not meet Plaintiff's quality control standards, eroding Plaintiff's valuable reputation and goodwill. Thus, the public interest weighs in favor of an injunction.

**E.    The TRO Should Issue Without Notice.**

The Marketplaces allow sellers of counterfeit and/or infringing goods, such as Defendants, to operate anonymously. From the undersigned counsel's considerable experience fighting counterfeiters and infringers, when a Marketplace does require sellers to provide physical contact information, this information is

consistently inaccurate, and sellers routinely provide false, incomplete, or misleading contact information. (Declaration of Jeffrey B. Sladkus ¶¶ 14-16.)

Moreover, the Court may grant an *ex parte* seizure order if providing notice to the Defendants would render fruitless the further prosecution of the action. *AT&T Broadband v. Tech Communications, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). This is particularly true when combatting counterfeiters. "The weight of authority around the country appears to favor the granting of *ex parte* seizure orders in trademark counterfeiting cases, where fake versions of well-known brands are deliberately passed off to the public as the genuine article." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 249-50 (S.D. Fla. 1982) (citing numerous cases). The justification for an *ex parte* seizure order is even more compelling where a significant amount of evidence pertaining to the counterfeiting activity is in electronic form, and therefore subject to quick, easy, and untraceable destruction by the Defendants. *Dell Inc. v. BelgiumDomains, LLC*, 2007 WL 6862341 at *2 (S.D. Fla. 2007); *see also Chanel, Inc. v. Chanel255.ORG, et al.*, 2012 WL 12845630 at *5 (S.D. Fla. 2012).

Defendants sell their counterfeit and/or infringing goods to customers in the United States exclusively online and accept payment only through on-line payment processors. Defendants can easily remove all evidence of their counterfeit goods

from their virtual storefronts and transfer any ill-gotten funds into foreign bank

accounts, where they are beyond this Court's reach. *See F.T.C. v. Atlantex Assoc.*,

872 F.2d 966, 968 (11th Cir. 1989) (affirming *ex parte* TRO and asset freeze order

against party accused of deceptive trade practices to preserve funds for possible

restitution). Therefore, it is imperative that Defendants not have advanced notice of

any TRO.

**IV.     THE COURT MAY ISSUE A TRO WITHOUT A BOND.**

Federal Rule of Civil Procedure 65(c) requires than an applicant for a TRO

or preliminary injunction provide security against the potential effects of a

wrongfully-issued injunction:

> No restraining order or preliminary injunction shall issue except upon
> the giving of security by applicant, in such sum as the court deems
> proper, for the payment of such costs and damages as may be incurred
> or suffered by any party who is found to have been wrongfully
> enjoined or restrained.

FED. R. CIV. P. 65(c). However, it is well-established in this Circuit that the amount

of security required by the rule is a matter within the discretion of the trial court,

and the court may elect to require no security at all. *BellSouth Telecom., Inc. v.*

*MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005);

*see also e.g. Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp.3d

1251, 1269 (N.D. Ga. 2018) (waiving bond requirement and citing *BellSouth*);

*AFC Enterprises, Inc. v. Rest. Grp. LLC*, 1:10-CV-1772-TWT, 2010 WL 4537812, at *5 (N.D. Ga. Nov. 3, 2010) (rejecting defendant's argument that preliminary injunction was improperly granted because no bond was required); *DJR Associates, LLC v. Hammonds*, 241 F. Supp.3d 1208, 1234 (N.D. Ala. 2017) ("The Eleventh Circuit . . . has said at least twice (although once in an unpublished opinion) that whether to set a bond as a condition to the issuance of a preliminary injunction and in what amount are within the discretion of the trial court."). Courts have held that security is not required when the moving party has a high probability of succeeding on its claim. *University Books and Videos, Inc. v. Metropolitan Dade County*, 33 F. Supp.2d 1364, 1374 (S.D. Fla. 1999). Finally, the burden is on the defendant to request a bond and submit evidence regarding the appropriate amount. *Mud Pie, LLC v. Deck the Halls, Y'all, LLC*, Case No. 17-CV-2789, 2017 WL 8942387 (N.D. Ga. Sep. 27, 2017) (ordering defendants to provide reasonable estimate of potential lost sales, with supporting documentation, within one week of order).

Plaintiff has demonstrated that it has a substantial likelihood of succeeding on the merits of its claims. Therefore, this Court may waive the requirement for Plaintiff to post security. Alternatively, Plaintiff requests that the Court order Defendants to appear and provide an estimate of their potential lost sales, with

supporting documentation, at the hearing on Plaintiff's motion for an order to show cause why a preliminary injunction should not issue.

## V.     AN ASSET FREEZE ORDER IS WARRANTED.

Plaintiff asks this Court to issue an order freezing Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces, including those in escrow, stored or processed by the Marketplaces, payment processors and/or financial institutions. Orders freezing a defendants' assets are warranted to assure the availability of permanent relief. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). Such asset freezes are particularly appropriate against sellers of counterfeit goods who are likely to hide their ill-gotten profits if their assets are not seized. *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992).

A court can issue an asset freeze when its equitable authority is invoked. Plaintiff seeks a permanent injunction, an accounting of Defendants' profits pursuant to the Lanham Act, and an award of its attorney's fees. Plaintiff has thereby invoked this Court's equitable authority. *Levi Strauss*, 51 F.3d at 987; *Wheeless v. Gelzer*, 765 F. Supp. 741, 743 (N.D. Ga. 1991) (holding that request for attorneys' fees and monetary awards that are restitutionary in nature are equitable.)

20

In Plaintiff's experience, sellers of counterfeit goods are not deterred by the threat of injunctions or post-judgment damages. If only enjoined by a court, they simply set up a new account under a new alias and continue selling their counterfeit goods. Additionally, counterfeiters can quickly and easily transfer funds to foreign accounts. This makes it easy to hide profits from the sale of counterfeit goods, making it impossible for Plaintiff to have a meaningful opportunity to seek redress in the form of permanent equitable relief, including disgorgement of profits.

Freezing Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces will also serve as a deterrent against future acts of counterfeiting and piracy. An equitable accounting of profits under the Lanham Act furthers the congressional purpose by making infringement unprofitable and is justified because it deprives defendants of unjust enrichment and provides a deterrent to similar activities in the future. *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988). Freezing the Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces will further the purposes of trademark law by making the sales of counterfeit goods unprofitable, depriving the Defendants of their unjust enrichment, and deterring future sales of counterfeit goods.

21

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (a) grant the Temporary Restraining Order for a period of fourteen (14) days; (b) order the relevant financial institutions and Marketplaces, upon receiving notice, to freeze Defendants' assets associated with the operation of their virtual storefronts on the Marketplaces, permanently remove any counterfeit or infringing product listings, and disable Defendants' virtual storefronts until the Court rules on Plaintiff's Motion for Preliminary Injunction; and (c) order that Defendants appear before this court to show cause why a preliminary injunction should not issue and provide an estimate of their lost sales with supporting documentation of on the date set forth in the TRO. Plaintiff further requests that the Court advance the trial on the merits and consolidate it with the hearing on Plaintiff's Motion for Preliminary Injunction pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

Dated: November 20, 2020.

Respectfully submitted,

THE SLADKUS LAW GROUP

*s/Jason H.Cooper*
Carrie A. Hanlon
Ga. Bar No. 289725

22

E-mail: carrie@sladlaw.com
Jeffrey B. Sladkus
Ga. Bar No. 651220
E-mail: jeff@sladlaw.com
Jason H. Cooper
Ga. Bar No. 778884
E-mail: jason@sladlaw.com
Bao-Ngoc Kim Dang
Ga. Bar No. 781673
E-Mail: kim@sladlaw.com

1397 Carroll Drive
Atlanta, GA 30318
Telephone: (404) 252-0900
Facsimile: (404) 252-0970

**Attorneys for Plaintiff**

## CERTIFICATE OF FONT & SIZE SELECTION

Pursuant to LR 7. 1(D), I certify that this paper was prepared with one of the

font and point selections approved by the Court in LR 5.1(B).

*s/Jason H. Cooper*
Jason H. Cooper